IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CALVIN AND BLANCHE WATSON | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 11-1762 |
| NATIONWIDE MUTUAL | : | |
| INSURANCE COMPANY OF | : | |
| NORTH AMERICA | : | |

## MEMORANDUM

**SURRICK, J.**                                                                    **JUNE __13__, 2012**

Presently before the Court is Defendant Nationwide Mutual Insurance Company of North

America's Motion for Partial Summary Judgment.  (ECF No. 17.)  For the following reasons, the

Motion will be granted.

## I.        BACKGROUND

### A.        Procedural History

On February 22, 2011, Plaintiffs Calvin and Blanche Watson filed a Complaint against

Defendant Nationwide in the Court of Common Pleas of Lancaster County, alleging breach of

contract ("Count I") and bad faith ("Count II").  (Compl., Def.'s Mot. Summ. J. Ex. A.)

Defendant removed the matter to this Court on March 10, 2011.  (Notice of Removal, ECF No.

1.)  On March 21, 2011, Defendant filed a motion to dismiss.  (ECF No. 3.)  Plaintiffs responded

soon thereafter.  (ECF No. 7.)  On October 12, 2011, we granted the motion in part and denied it

in part.  (Court Mem., ECF No. 8.)  Defendant filed an Answer on October 26, 2011.  (ECF No.

10.)

Defendant filed the instant Motion on April 16, 2012.  (Def.'s Mot. Summ. J., ECF No.

17; Def.'s Br., ECF No. 18.)  Plaintiffs responded on April 30, 2012.  (Pls.' Resp., ECF No. 19.)

The case is scheduled for trial on June 25, 2012.

    **B.**    **Factual Summary**[1]

On the afternoon of November 23, 2008, Plaintiff Blanche Watson ("Mrs. Watson") was driving a 2008 Toyota Prius (the "Prius") on North Reading Road in Ephrata Township, Pennsylvania. (Compl. ¶ 6.) The Prius was owned by Mrs. Watson and her husband, Plaintiff Calvin Watson ("Mr. Watson"). (*Id*. at ¶ 3.) Plaintiffs had purchased automobile insurance from Defendant which covered the Prius. (*Id*.) The terms of the policy guaranteed Plaintiffs first-party medical benefits ("PIP") and uninsured motorist benefits ("UM"), among other coverage. (*Id*.)[2]

The Prius was struck from behind by a car driven by Gina Ford, an unlicensed and uninsured driver who fled the scene. (Compl. ¶¶ 6-7.) The Prius was significantly damaged and declared a total loss. (*Id*. at ¶ 8.) Mrs. Watson felt her neck twist, and sustained trauma to her right knee, which had hit the dashboard. She also sustained back and shoulder injuries. (*Id*. at ¶ 10; Watson Dep. 26, 41, Def.'s Mot. Summ. J. Ex. K.) Mrs. Watson was taken to Ephrata Community Hospital, where she was examined, and diagnosed with a contused right knee. (Skrimcovsky Report 000334, Def.'s Mot. Summ. J. Ex. D; Kliger Report 000316, Def.'s Mot. Summ. J. Ex. E.) Mrs. Watson was advised to consult with her primary care physician within

---

[1] We "view the facts in the light most favorable to [Plaintiffs], and draw all reasonable inferences therefrom in that party's favor." *N.J. Transit Corp. v. Harsco Corp.*, 497 F.3d 323, 326 (3d Cir. 2007). Plaintiffs' breach of contract claim is not at issue in the instant Motion.

[2] Plaintiffs received several classes of benefits from Defendant. PIP benefits cover medical treatment necessitated by the accident. UM benefits cover bodily injury arising out of an incident in which another driver is uninsured. *See* 75 Pa. Cons. Stat. Ann. § 1731(b) (setting forth Pennsylvania law related to UM coverage). Other benefits covered damage to the automobile itself. (*See* Insurance Policy, Def.'s Mot. Summ. J. Ex. I.)

two weeks, and treated with Advil and ice in the interim.  (Watson Dep. 32, 43.)  Mrs. Watson

visited her primary care physicians, Drs. Chelius and Bohn, at Conestoga Family Practice on

December 2, 2008.  (*Id*. at 42.)  Dr. Chelius injected Mrs. Watson's knee with cortisone, advised

her to apply heat and ice to her neck, and advised that a brace might mitigate her knee pain.  (*Id*.

at 43-45.)  Her condition improved in the ensuing weeks and months.  (*Id*. at 49-50.)

On February 10, 2009, Mrs. Watson consulted with Dr. Clayton Hollinger at Wenger

Chiropractic ("Wenger") about her neck and shoulder pain.  (*Id*. at 48-49, 51.)  This was the first

of six such visits to Wenger through March 31, 2009.  (*Id*. at 53.)  According to Mrs. Watson, the

treatment was mostly unhelpful.  (*Id*.)  Wenger provided treatment, but did not provide referrals

to additional specialists or conduct extensive imaging or X-rays.  (*Id*. at 53-55.)

Six to seven months after the accident, Mrs. Watson began to experience pain in her

lower back.  (*Id*. at 39.)  She was informed by several doctors—Dr. Bohn, her chiropractor, Dr.

Hollinger and Dr. Marcelino Oliveri, D.O., to whom Mrs. Watson was referred by Dr. Bohn (*id*.

at 55)—that the pain was connected to the accident.  (*Id*. at 39-40.)  Mrs. Watson visited Dr.

Hollinger frequently between March 5, 2010 and April 5, 2010.  She visited Dr. Bohn in April,

June and July of 2010.  During the April 26, 2010 visit, she received X-rays of her lumbar spine.

(Pls.' Resp. Ex. 6.)  She also visited Dr. Oliveri in August, September and December of 2010, in

order to receive lumbar facet injections and a lumbar MRI.[3]  (Antin Report 000303, Def.'s Mot.

Summ. J. Ex. G.)  In addition, Mrs. Watson received physical therapy at the Rehab Center in

Ephrata six times in August and September of 2010.  (Watson Dep. 56, 76.)  In 2011, Mrs.

---

[3] There is some confusion as to when Mrs. Watson began treatment with Dr. Oliveri. (*See* Watson Dep. 57-59.)  There is no evidence of her consulting with him prior to 2010.

Watson began treatment at Crossroads Surgical Center.  (*Id*. at 80-82.)

Mrs. Watson's PIP claim was handled by Temika Sloane, an adjuster with Defendant. (Pls.' Answers to Interrogatories 1, Def.'s Mot. Summ. J. Ex. C.)  On November 24, 2008, Sloane and Mrs. Watson discussed the claim handling process.  (Reif Report 8, Def.'s Mot. Summ. J. Ex. Q.)  Defendant made all payments through March 31, 2009, and the PIP file was closed on May 18, 2009.  (*Id*.)  Defendant informed Mrs. Watson that it would no longer pay for treatments.  (Watson Dep. 57.)  When Mrs. Watson re-initiated contact with Sloane in March 2010, Sloane, citing the lapse between treatments, determined that Mrs. Watson's future medical bills should be evaluated using the peer review process.  (*Id*. at 8-9.)

Defendant initiated three separate peer reviews, conducted through JM Consulting, Inc., an entity also known as The Prime Network ("Prime").  (Compl. ¶ 18; *see also* Pls.' Resp. Ex. 11.)  The first review, conducted by Dr. Jason M. Skrimcovsky, D.C., was completed on June 1, 2010, and concerned Mrs. Watson's treatment at Wenger.  Dr. Skrimcovsky concluded that all treatment conducted between February 10, 2009 and March 31, 2009, as well as treatment conducted between March 5, 2010 and April 5, 2010, was reasonable and necessary. (Skrimcovsky Report 3.)  Dr. Skrimcovsky opined that all treatment after April 5, 2010 was unreasonable and unnecessary.  (*Id*. at 2.)  He based this conclusion on the "established therapeutic protocols for the documented diagnoses," which he stated would render treatment above and beyond a specific number of visits to be unnecessary.  (*Id*. at 2-3.)

Dr. Morris J. Kliger, D.O., reviewed Mrs. Watson's treatment with Dr. Bohn at

Conestoga, in a report dated November 24, 2010.  (Kliger Report 000316.)[4]  According to

Defendant, Dr. Kliger concluded that treatment beyond March 31, 2009 "cannot be supported as

reasonable or necessary."  (Def.'s Br. 16.)  Defendant further states that Dr. Kliger concluded that

"all treatment [at Conestoga] beginning 4/26/10 . . . cannot be supported as reasonable or

necessary for injuries sustained" in the accident.  (*Id*.)

The third peer reviewer, Dr. Mitchell E. Antin, D.O., evaluated treatments provided by

Dr. Oliveri in a report dated January 12, 2011.  (Antin Report 000303.)  Dr. Antin determined

that Mrs. Watson's initial consultation with Dr. Oliveri on September 3, 2010, was reasonable

and necessary, but that all subsequent tests (including the lumbar MRI), treatments and

consultations were medically unreasonable and unnecessary.  (*Id.* at 000304-05.)

At the request of Plaintiffs' counsel, Defendant initiated a fourth peer review, conducted

by Dr. Anthony E. DiMarco, D.O., to determine the propriety of treatment with Dr. Bohn.

(DiMarco Report 000327, Def.'s Mot. Summ. J. Ex. F.)  Noting that treatment plans need to be

modified if a patient's condition is not improving, Dr. DiMarco cited gaps in Mrs. Watson's

treatment with Dr. Bohn to determine that "Ms. Watson was a noncompliant patient and

therefore it was very difficult for Dr. Bohn to treat her."  (*Id*. at 000328.)  According to Dr.

DiMarco, treatment after March 5, 2009 was unreasonable and unnecessary, and referrals after

---

[4] Pages of the Kliger Report are missing from the documentation filed with the Court by Defendant, including a page which features Dr. Kliger's conclusions and is cited by Defendant in its brief.  (*See* Def.'s Br. 16.)  We further note discrepancies between the ordering and substance of the exhibits filed on the Electronic Court Filing system (ECF) and the courtesy copy provided the Court.

the September 3, 2010 lumbar examination were unreasonable and unnecessary.  (*Id*.)[5]

Defendant refused to pay for some of the second round of claims; however, Plaintiffs concede that Defendant eventually "agreed to pay the rest of the chiropractor['s]" bill.  (Watson Dep. 67.)  Defendant also paid for a September 2010 visit to Conestoga.  (*See* Pls.' Resp. Ex. 17 at 000090.)  Ultimately, Plaintiffs paid out-of-pocket medical expenses of $587.02.  (Pls.' Resp. 16.)  The remaining bills were paid by Mrs. Watson's Medicare Advantage plan, HealthAmerica, with the exception of her treatment at the Rehab Center.  (Watson Dep. 64-65.)  Plaintiffs claim that the plan has a $3,631.67 lien on funds received by Plaintiffs.  (Pls.' Resp. 16.)[6]

Plaintiff's claim for benefits under the policy's UM coverage was assigned to Donna Gardner, a liability adjuster.[7]  (Reif Report 7-8.)  Gardner contacted Mrs. Watson on November 24, 2008, one day after the accident.  (Gardner-Watson Transcript, Pls.' Resp. Ex. 4.)  Gardner spoke with Mrs. Watson again on December 4, 2008.  (Gardner Notes 000079, Pls.' Resp. Ex. 15.)  Mrs. Watson's UM claim was assessed to be worth between $0 and $2,500.  (*Id*. at 000068.)

---

[5] A later examination by Dr. Thomas D. DiBenedetto, M.D., described Plaintiffs' injuries as related not to the accident, but to "the natural progression of degenerative disease in her lumbar spine."  (DiBenedetto Report 7, Def.'s Mot. Summ. J. Ex. H.)  This contradicted a February 2, 2012 assessment by Dr. Oliveri, who concluded that "the motor vehicle accident certainly aggravated [Mrs. Watson's] pre-existing condition," and that "the treatment was reasonable and necessary for symptoms that were aggravated or caused by the automobile accident."  (Oliveri Report 2, Def.'s Mot. Summ. J. Ex. J.)

[6] Plaintiffs claim that "Blanche's [M]edicare [A]dvantage plan [] is asserting a lien that must be repaid."  (Pls.' Resp. 19.)  Plaintiffs do not demonstrate that the lien "must be repaid."  A Medicare Advantage organization ("MAO") may seek repayment of liens from tort recovery, but such repayment is not automatic.  There is no legal basis for the conclusion that, regardless of the outcome of this litigation, Plaintiffs will be indebted to their MAO.  *See, e.g.*, *In re Avandia Marketing*, No. 07-MDL-1871, 2011 U.S. Dist. LEXIS 63544 (E.D. Pa. June 13, 2011).

[7] Kristina Baker took over management of the claim in March 2011 after this litigation was initiated.  (Baker Dep. 9, Pls.' Resp. Ex. 12.)

Defendant and Mrs. Watson engaged in a back-and-forth over the course of several weeks, during which time Defendant offered between $1,000 and $1,600, and Plaintiffs' demand fluctuated between $1,750 and $2,000.  (*Id*. at 000065.)  Gardner noted that Mrs. Watson's injuries appeared to be limited.  (*Id*.)  On January 6, 2009, Mrs. Watson received a $1,700 payment from Defendant under the policy's UM coverage.  (UM Receipt, Baker Dep. Exs. 3, Pls.' Resp. Ex. 13.)  Defendant subsequently offered "an additional $5,000 for full settlement of [Plaintiffs'] [UM] claim for the above loss."  (Baker Letter 1.)

## II.    LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").  Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 325 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).  If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact is genuinely . . . disputed must support the assertion by . . . citing to particular parts of materials in the record."); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (noting that the nonmoving party "must do more than simply

show that there is some metaphysical doubt as to the material facts").  "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citations omitted).  Courts must not resolve factual disputes or make credibility determinations.  *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## III.   DISCUSSION

Plaintiffs raise two claims in their Complaint.  Plaintiffs' claim for breach of contract by Defendant is not at issue here.  Our focus is solely on whether Plaintiff can justify proceeding to trial on its claim that Defendant has acted in bad faith.

### A.    Bad Faith in Peer Review Process

#### 1.    *Legal Standard for Bad Faith in Insurance*

Under Pennsylvania law, an insured individual may seek damages for an insurer's bad faith actions.  *See* 42 Pa. Cons. Stat. Ann. § 8371.  This statutory remedy is available not only for an insurer's "bad faith in denying a claim," but "may also extend to the insurer's investigative practices."  *O'Donnell ex rel. Mitro v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa. Super. Ct. 1999).

The Third Circuit has described "the essence of a bad faith claim" as "the unreasonable and intentional (or reckless) denial of benefits."  *UPMC Health Sys.*, 391 F.3d at 506.  "Merely negligent conduct, however harmful to the interests of the insured, is recognized by Pennsylvania courts to be categorically below the threshold required for a showing of bad faith."  *Greene v. United Servs. Auto. Ass'n*, 936 A.2d 1178, 1189 (Pa. Super. Ct. 2007); *see also Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994) ("[I]t is not necessary that such refusal be fraudulent . . . mere negligence or bad judgement is not bad

8

faith"). "Ultimately, in order to recover on a bad faith claim, the insured must prove: (1) that the insurer did not have a reasonable basis for denying benefits under the policy; and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim." *Northwestern Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005). Thus, an insurer can defeat a claim of bad faith by showing that it had a reasonable basis for its actions. *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 307 (3d Cir. 1995).

To sustain a claim under § 8371, a plaintiff must prove bad faith "by clear and convincing evidence." *Terletsky,* 649 A.2d at 688. It is insufficient to "merely insinuate[]" that bad faith exists. *Id*. "[T]his heightened standard requires the insured to provide evidence so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith." *Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167, 169 (3d Cir. 2011) (citations omitted). "At the summary judgment stage, the insured's burden in opposing a summary judgment motion brought by the insurer is commensurately high because the court must view the evidence presented in light of the substantive evidentiary burden at trial." *Babayan*, 430 F.3d at 137 (citations omitted).

### 2.     *MVFRL Preemption and Bad Faith Actions*

Defendant argues that the Pennsylvania Motor Vehicle Financial Responsibility Law ("MVFRL"), 75 Pa. Cons. Stat. Ann. § 1797(b), preempts Plaintiffs' recovery. (Def.'s Mot. Summ. J. 9.) Defendant previously raised this argument in its motion to dismiss. (Def.'s Mem. on Mot. to Dismiss 9, ECF No. 4.)

In resolving Defendant's motion to dismiss, we noted that while § 8371 serves as a general remedy for an insurer's bad faith conduct toward its insured, § 1797(b) carves out an

exception to that remedy.  (Court Mem. 3-4 (citing *Schwartz v. State Farm Ins. Co.*, No. 96-160, 1996 WL 189839, at *4 (E.D. Pa. Apr. 18, 1996)).)  We noted that "a claim for statutory bad faith under § 8371 is preempted by § 1797(b), where the claim is based on an insurer's wrongful denial of first-party benefits."  (Court Mem. 4.)  However, we also stated that "a § 8371 claim is not barred if the insurance company's alleged bad faith conduct went beyond the scope of § 1797," and cited an insurer's potential abuse of the peer review process itself as an example of such conduct.  (*Id.*)  We concluded simply that Plaintiffs had "alleged sufficient facts to withstand a motion to dismiss," and permitted them to proceed with the bad faith claim "to the extent that [Plaintiffs] allege an abuse or misuse of the peer review process."  (*Id.* at 5); *see also Dougherty v. State Farm Mut. Auto. Ins. Co.*, No. 00-4734, 2002 U.S. Dist. LEXIS 4691, at *4-5 (E.D. Pa. Feb. 7, 2002) (articulating circumstances in which § 1797 does not bar a claim under § 8371).  While Plaintiffs' allegations regarding abuse of the peer review process were sufficient to state a claim, this does not mean they can necessarily survive a motion for summary judgment.

To show bad faith under the § 1797 exception, Plaintiffs must show that Defendant's handling of the peer review process deviated from the norm provided by law.  The MVFRL outlines the procedure by which an insurer may initiate a peer review process to determine if particular medical treatments are necessary:

> Insurers shall contract jointly or separately with any peer review organization established for the purpose of evaluating treatment, health care services, products or accommodations provided to any injured person.  Such evaluation shall be for the purpose of confirming that such treatment, products, services or accommodations conform to the professional standards of performance and are medically necessary.  An insurer's challenge must be made to a PRO within 90 days of the insurer's receipt of the provider's bill for treatment or services or may be made at any time for continuing treatment or services.

75 Pa. Cons. Stat. Ann. § 1797(b).  Furthermore,

> [a] provider's bill shall be referred to a PRO only when circumstances or conditions relating to medical and rehabilitative services provided cause a prudent person, familiar with PRO procedures, standards and practices, to believe it necessary that a PRO determine the reasonableness and necessity of care, the appropriateness of the setting where the care is rendered, and the appropriateness of the delivery of the care.

31 Pa. Code § 69.52(a).

### 3.   *Plaintiffs' Bad Faith Claims*

Plaintiffs claim that Defendant abused the peer review process in several ways.  First, Plaintiffs argue that the "decision to refer all future medical bills to PRO before they were even received by the first-party adjuster was a sham referral."  (Pls.' Resp. 7.)  Plaintiffs claim "there is evidence in the record . . . that shows that the PRO reports and Nationwide's decision not to pay certain bills was based on causation and relatedness," instead of the permitted bases of reasonableness and necessity.  (*Id*. at 9-10.)  Plaintiffs claim that Defendant failed to inform doctors participating in the peer review process about "the details and force of the collision," and other facts, and that these omissions constitute acts of bad faith.  (*Id*. at 20-21.)  Finally, Plaintiffs claim that there exists a conflict of interest between Defendant and Prime, thereby "rais[ing] doubt about the impartiality of the PRO reviewers."  (*Id*. at 21-22.)[8]

---

[8] Plaintiffs argue that Dr. DiBenedetto's history as an expert witness requires a credibility determination, which is for the jury.  (*Id*. at 22-23.)  Dr. DiBenedetto's past experience as an expert witness does not constitute an issue of material fact which justifies proceeding to trial on Count II.  In any event, the factual dispute cited by Plaintiffs as to the cause of Mrs. Watson's injuries will be resolved by a jury in the context of factfinding related to Count I of the Complaint.  This factual dispute bears on causation, and not on whether Defendant had a reasonable basis for denying benefits, or whether Defendant acted in bad faith.

Plaintiffs also suggest we deny summary judgment because "[i]t is reasonable that a jury would be sympathetic to [Mrs. Watson] because of the conduct of the tortfeasor [Gina Ford]."  (Pls.' Resp. 14.)  The possibility that a jury might let its sympathies for a party dictate its findings of fact—because of the conduct of a third party not involved in the present litigation—is *not* a

Plaintiffs' claim that Defendant's decision to seek peer review was a "sham referral" is without basis.  The fact that Defendant referred procedures to the PRO prior to the receipt of bills is not incriminating; in fact, it suggests that the goal of the evaluation was not denial of specific payments, but instead to "confirm[] that such treatment, products, services or accommodations conform to the professional standards of performance and are medically necessary."  75 Pa. Cons. Stat. Ann. § 1797(b).  Plaintiffs provide no evidence that Defendant sought a peer review because of any improper motives.  Plaintiffs also offer no support for the statement that "decisions were made based on causation or relatedness."  Defendant had questions about the reasonableness and necessity of Mrs. Watson's treatments, given the time lapse between treatments and the seemingly minor nature of Mrs. Watson's injuries.

Plaintiffs and their expert, Michael Reif, repeatedly note that the adjuster never advised the peer review group that "the impact to the rear of Mrs. Watson's vehicle was so severe that damage was in excess of $23,000 and the vehicle was deemed to be a total loss."  (Reif Report 9.)  It is not clear how such information is relevant to the peer review process.  The purpose of peer review is to determine the legitimacy and propriety of providing medical benefits to an insured.  It is interesting that Plaintiffs criticize Defendant's failure to provide such information while simultaneously claiming that the peer reviewers improperly considered the issues of causation and relatedness.  The force of the collision or extent of damage to the Prius is relevant *only* in a causation analysis; it does not affect whether or not the medical treatment received by

---

reason to let Count II proceed to trial.

Mrs. Watson was, in fact, reasonable and necessary.[9]

Plaintiffs' bald statement that "[w]hether or not the PRO Vendor Referral form contains accurate information is for the fact-finder to resolve" does not make it so.  (Pls.' Resp. 21.) Plaintiffs nowhere specify which information in these forms is inaccurate.  Plaintiffs merely repeat their contention that Defendant did not advise peer reviewers of the impact to Mrs. Watson's vehicle, did not mention "that Blanche complained about back pain from the first day," and that the form "is full of hearsay allegedly from telephone conversations with the insured." (Pls.' Resp. 21.)  These alleged inadequacies do not create material issues of fact that a factfinder must resolve, because Plaintiffs never explain how these issues might have affected the peer reviewers' assessments or how they might otherwise establish the fact that the peer review process was a sham.

Plaintiffs' argument that a conflict of interest exists between Defendant and Prime, and that such conflict undermined the impartiality of the peer reviewers, is baseless.  Plaintiffs cite two pieces of "evidence" to support this claim.  First, Plaintiffs claim that after serving a subpoena on Prime, "Attorney Charles E. Haddick wrote two letters to counsel" on behalf of Prime, thus proving "that the attorney for Nationwide also represents" Prime.  (Pls.' Resp. 21-22.)  Second, Plaintiffs point to the Master Service Agreement (Pls.' Resp. Ex. 11) between

---

[9] Contrary to Plaintiffs' assertions, Defendant did, in fact, recognize several of Mrs. Watson's post-2009 medical treatments as "reasonable and necessary," and paid those bills accordingly.  We cannot conclude that a peer review process, which deemed several of Mrs. Watson's treatments to be reasonable and necessary, and which ultimately led to Defendant's payment for those treatments, is a sham.  The fact that not every bill of Mrs. Watson's was paid does not mean that the process itself lacked credibility or was conducted in bad faith. Defendant's denials of some treatment had a "reasonable basis," inasmuch as they reflected the assessments of several independent physicians who concluded that the treatments were unreasonable and unnecessary.

Prime and Defendant as proof of this conflict.  (*Id*. at 21-22.)

Plaintiffs mischaracterize Haddick's letters to counsel.  While Plaintiffs claim that Haddick was acting as Prime's attorney, there is simply no evidence to support this contention. Haddick's letter and objections (Pls.' Resp. Ex. 11) were on behalf of his client, Defendant Nationwide, and not on behalf of Prime.[10]  Plaintiffs' assertion that Haddick represents both Defendant and Prime finds no support in the record.  Plaintiffs seem to assert that the existence of a transactional relationship between Defendant and Prime calls into question the credibility of the whole peer review process.  Since Haddick does not represent Prime, we are at a loss to determine how this raises doubt about the impartiality of the PRO reviewers.

Plaintiffs' second assertion also lacks merit.  Plaintiffs insinuate that "[t]he time line raises an inference that perhaps the Master Service Agreement was only finalized after a favorable report by Dr. Skrimcovsky."  (Pls.' Resp. 22.)  The suggestion that a corporate Defendant would condition a three-year services contract, which was not limited to reviewing Mrs. Watson's treatment, on Dr. Skrimcovsky's evaluation, lacks credibility.  There is no reasonable basis for such an "inference."  Plaintiffs have failed to demonstrate how the credibility of the reviewers or basis for Defendant's denial of some benefits were affected by the timing of the agreement.  Defendant and Prime came to an agreement beginning May 1, 2010, which was signed by the parties on May 24, 2010 and June 2, 2010, respectively.  The fact that

---

[10] "[A] party to an action has standing to quash or modify a non-party subpoena where the party seeking to quash or modify the subpoena claims a privilege or privacy interest in the subpoenaed information.."  *Schlumovich v. 1161 Rt. 9 LLC*, No. 07-597, 2008 U.S. Dist. LEXIS 81317, at *12-13 (D.N.J. Oct. 14, 2008).  Defendant had a clear interest in protecting the confidentiality of "individuals other than Plaintiff," given the nature of Plaintiffs' subpoena request.  (Objections ¶ 3, Pls.' Resp. Ex. 11.)   We further note that Plaintiffs did not attempt to contest this issue formally before the Court at the time that the objections were filed.

the Skrimcovsky Report was dated June 1, 2010 is irrelevant.

A recent case from the Western District of Pennsylvania addressed similar facts. In *Hampton v. GEICO General Insurance Co.*, the plaintiff accused defendant GEICO of "repeatedly selecting the Prime Network, which had a financial interest in providing biased reviews, as the PRO to review Plaintiff's medical treatment, knowing that the Prime Network was biased in GEICO's favor." 759 F. Supp. 2d 632, 645 (W.D. Pa. 2010) (citing plaintiff's complaint). The court in *Hampton* noted that Plaintiff had, as a matter of law, "utterly failed" to demonstrate that GEICO's choice of PRO was motivated by such bias, and had "offer[ed] no evidence to support her allegations" in this regard. *Id*. at 649-50. The situation here is similar. Plaintiff has offered no evidence that Defendant's handling of the peer review process was conducted in bad faith. Given the nature of Mrs. Watson's injuries, and the amount of time that had lapsed between treatments, it is clear that a prudent person could "believe it necessary that a PRO determine the reasonableness and necessity of care." 31 Pa. Code § 69.52. Although the determinations of the doctors engaged in the peer review process, and indeed the determination made by Defendant in denying some coverage, may have been erroneous, that is not a matter for our consideration at this time. We are asked only to determine whether the decision to refer Mrs. Watson's claims to the peer review process constituted bad faith, and whether the process itself was a sham. We find no evidence that, as to PIP benefits, the review process was initiated in bad faith.

We further distinguish the instant action from *Bubb v. Nationwide Mutual Insurance Co.*, No. 99-1852, 2000 U.S. Dist. LEXIS 22692 (M.D. Pa. Aug. 10, 2000). In *Bubb*, the court determined that a limited "records review" conducted by a single doctor, which focused on

15

causation, left an issue of fact for trial as to whether Nationwide had a reasonable basis for denying benefits. Here, Defendant consulted four separate medical professionals as reviewers prior to determining that it would not pay for all treatments. Defendant's reviewers did not base their analyses on causation. They focused on the necessity and reasonableness of the treatment. Defendant had a reasonable basis for the decisions it made. There is no genuine issue of material fact. We are compelled to conclude that Defendant did not act in bad faith.

### B.      Defendant's Handling of UM Claim[11]

Plaintiffs include several allegations related to Defendant's handling of Plaintiff's UM claim. First, Plaintiffs claim that Gardner "was aware that Mrs. Watson lacked the ability to understand" the UM coverage, given her lack of education, and that Gardner never informed Mrs. Watson of her rights under the policy. (Pls.' Resp. 11-12.) Second, Plaintiffs claim that Gardner did not conduct any investigation of the UM claim aside from speaking with Mrs. Watson, and that this failure to investigate continued "for more than two years" after the January 2009 payment of UM benefits to Mrs. Watson. (*Id*. at 12-13.) Finally, Plaintiffs claim that Defendant's $5,000 offer, made in November 2011, was insufficient and that "Plaintiffs do not consider that 'negotiations.'" (*Id*. at 14.)

Defendant's handling of Mrs. Watson's UM claim was unrelated to its handling of her PIP claims. UM claims are distinct from PIP claims; UM coverage "provide[s] protection for persons who suffer injury arising out of the maintenance or use of a motor vehicle and are legally

---

[11] Plaintiffs raise Defendant's handling of the UM claim in their Response. (Pls.' Resp. 11-13.) However, we note that Plaintiffs declined to answer several interrogatories posed by Defendant on the grounds that "this case does not pertain to an [uninsured motorist] claim." (*See* Pls.' Answers to Interrogatories ¶¶ 13-14.)

entitled to recover damages therefor from owners or operators of uninsured motor vehicles." 75 Pa. Cons. Stat. Ann. § 1731(b); *see also Allstate Prop. & Cas. Ins. Co. v. Squires*, 667 F.3d 388, 389 (3d Cir. 2012).

Plaintiffs' characterization of the events surrounding the UM claim is incomplete. Although Plaintiffs claim that Mrs. Watson was unsophisticated and unable to understand the specifics of the policy and the coverage to which she was entitled, the record indicates that Mrs. Watson engaged in negotiations with Defendant.[12]  These negotiations included several offers and counteroffers.  (*See*, *e.g.,* Gardner Notes 000065.)  Plaintiffs discussed the offers extensively among themselves and were not rushed into making decisions.  Furthermore, Plaintiffs consulted with counsel, who advised that a proper demand was $2,000.  (*Id*.)  Contrary to Plaintiffs' assertion that Defendant manipulated an uneducated party into accepting a deficient offer, it is clear that the parties engaged in serious negotiations which yielded a mutually favorable result.

We are also unpersuaded by Plaintiff's allegations that Defendant failed to conduct adequate investigation in determining the value of Plaintiffs' UM claim.  Gardner spoke with Mrs. Watson and her husband repeatedly over the course of several weeks.  (*See* Gardner Notes.) Based on these conversations, Gardner was able to assess the value of the UM claim.  She noted that Plaintiffs claimed "no loss of income."  (*Id*. at 000097.)  She further noted that Mrs. Watson claimed to be "experiencing depression, anxiety, and sleep disturbance due to the accident."  (*Id*. at 000068.)  In explaining the logic of Defendant's offer, Gardner observed that Mrs. Watson needed only a single follow-up medical visit, and reiterated that the purpose of UM damages was

---

[12] While Plaintiffs imply that Defendant sought to take advantage of Mrs. Watson, Defendant never asked Plaintiffs to waive rights or otherwise release Defendant from further liability in exchange for the $1,700 payment.

not to recompense Plaintiffs for their loss of property.  (*Id*. at 000065.)

Although Plaintiffs argue that Defendant's investigation was inadequate, Plaintiffs do not indicate what information such investigation might have yielded, or how such investigation would have led a reasonable person to conclude that Mrs. Watson's UM claim was worth substantially more than what she agreed to and ultimately received.

The claim that Defendant's $1,700 offer was conducted without negotiations, and thus points to "bad faith," is unsupported by evidence.  Plaintiffs, on the advice of counsel, only demanded $2,000 for the UM claim.  Plaintiffs received 85 percent of their requested amount. There is simply no evidence of "bad faith" or failure to negotiate in Defendant's handling of Plaintiffs' UM claim.

### C.  Defendant's Alleged Bad Faith During Litigation

Plaintiffs allege that Defendant has acted in bad faith throughout the course of the litigation.  Plaintiffs cite to several examples of conduct that they believe constitute bad faith.

"[T]he broad language of section 8371 was designed to remedy all instances of bad faith conduct by an insurer, whether occurring before, during or after litigation."  *O'Donnell*, 734 A.3d at 906.  Since "the conduct of an insurer during the pendency of the litigation may be considered as evidence of bad faith," we will examine Defendant's behavior since this action was filed.

What actually constitutes bad faith during litigation is limited.  The *O'Donnell* court, citing federal and state courts which have interpreted § 8371, wrote that "the statute clearly does not contemplate actions for bad faith upon allegations of discovery violations."  *Id*. at 908; *see also W.V. Realty Inc. v. N. Ins. Co.*, 334 F.3d 306, 313 (3d Cir. 2003) ("In those cases in which nothing more than discovery violations were alleged, courts have declined to find bad faith.").

Rather, courts have held that an insurer must attempt to obstruct the litigation or otherwise engage in "frivolous behavior." *Sicherman v. Nationwide Life Ins. Co.*, No. 11-7227, 2012 U.S. Dist. LEXIS 47630, at *13 (E.D. Pa. Apr. 2, 2012).  An example of bad faith would be "initiating an action against an insured in a bad faith effort to evade a duty owned under a policy." *Slater v. Liberty Mut. Ins. Co.*, No. 98-1711, 1999 U.S. Dist. LEXIS 3753, at *6 n.3 (E.D. Pa. Mar. 30, 1999).  Counsel's misbehavior must be serious to justify a finding of bad faith.

Plaintiffs allege that Defendant attempted to "delay discovery on bad faith and treat[] the cases as if it had been bifurcated."  (Pls.' Resp. 28.)  As an example of this, Plaintiffs note that Defendant "brought two attorneys to depositions and they both participated in questioning witnesses."  (*Id*.)  Defendant also produced the same documents twice, with two different numbering systems.  (*Id*. at 28-29.)  "Three attorneys and one adjuster" have communicated with Plaintiff's counsel over the course of this litigation, thereby "interfer[ing] with the handling of the suit."  (*Id*. at 29.)  These communications, Plaintiffs claim, have "include[d] threats to take various matters to Court."  (*Id*.)  Finally, Plaintiffs argue that Defendant has willfully withheld policy manuals related to the types of claims related to this matter.  (*Id*. at 30-31.)

Plaintiffs also point to Defendant's settlement offers as an example of bad faith, calling the offer "vindictive" and alleging that if "accepted, it would allow any insurance company to refuse to pay any medical bills and then look for a favorable medical report years later."  (Pls.' Resp. 15.)  According to Plaintiffs, while Defendant "would have the Court believe" that the settlement offers are "just a difference of opinion as to subjective complaints of injury," Defendant's $5,000 "offer is too low to be good faith."  (*Id*.)[13]

---

[13] Plaintiffs' demand was "$85,000 for a global settlement."  (Pls.' Resp. 15.)

Such questions are not for this Court to determine; the parties are not obligated to make any settlement offers, let alone attractive ones.  There is no reason to suspect that Defendant lacked "any reasonable basis" for its settlement offer.  This offer would have covered Plaintiff's out-of-pocket medical expenses and provided for pain and suffering.  It does not qualify as an act of bad faith.  *See, e.g.*, *Carcarey v. GEICO Gen. Ins. Co.*, No. 10-3155, 2011 U.S. Dist. LEXIS 123679, at *7 (E.D. Pa. Oct. 26, 2011) (inadequate settlement offer alone is not basis for bad faith claim).

Plaintiffs' other allegations center on Defendant's litigation strategy, but do not demonstrate the possibility of bad faith.  Although Plaintiffs' use of multiple attorneys may have led to some confusion, it is hardly probative of Defendant's evasion of its responsibilities.  Defendant's non-disclosure of policy manuals is only relevant if those policy manuals in fact exist and are discoverable.  Plaintiffs' citation to unrelated cases does not demonstrate that they do or are.[14]  Similarly, Plaintiffs cannot credibly point to any meaningful delay in discovery.  This

---

[14] Plaintiffs point to *Bonenberger v. Nationwide Mutual Insurance Co.*, 791 A.3d 278 (Pa. Super. Ct. 2002), *Consugar v. Nationwide Insurance Co. of America*, No. 10-2084, 2011 U.S. Dist. LEXIS 61756 (M.D. Pa. June 9, 2011), and *Berg v. Nationwide Mutual Insurance Co.*, No. 12-MDA-2008, 2012 Pa. Super. LEXIS 169 (Pa. Super. Ct. Apr. 17, 2012), in support of their contention that Defendant maintains such policy manuals.  In those cases, courts noted the existence of claims strategy manuals which were probative of bad faith on the part of this Defendant.

Any indication that a party has suppressed relevant, discoverable evidence would be problematic.  Plaintiffs allege this, but offer no basis for such a conclusion.  The existence of manuals in other cases is not dispositive here.  Furthermore, Plaintiffs state that they "determined that the withheld information was not necessary to prove their case and therefore did not file a Motion to Compel."  (Pls.' Resp. 30.)  Had such a motion been filed, we would have entertained it at the proper time.  Plaintiffs' concession that the information requested was unnecessary satisfies us that even if the manuals did exist, and were discoverable, Defendant's failure to provide them was not egregious and cannot alone sustain Plaintiffs' claim of bad faith during litigation.

case is still governed by the Scheduling Order (ECF No. 15) issued November 18, 2011, which ordered discovery to be completed by April 2, 2012.

Although there is no evidence of "frivolous behavior" on the part of Defendant, elements of Plaintiffs' bad faith claim border on frivolous.  It is not bad faith for Defendant to bring two attorneys to a deposition.  It is not bad faith for Defendant's counsel to send multiple letters to Plaintiffs' counsel.  We note that while Plaintiffs' counsel argues that Defendant "interfered with the handling of the suit, drove up time and charges, created unnecessary work, delayed discovery until the last minute, and obstructed the depositions," Plaintiffs' counsel has not contacted the Court about this improper behavior.  (Pls.' Resp. 29.)

Plaintiffs cannot carry their burden at trial with regard to Defendant's alleged bad faith during litigation.  We see no evidence of inappropriate conduct.  The claim that Defendant acted in bad faith during this litigation is without any basis.  Plaintiffs have not offered sufficient evidence of bad faith to create a genuine issue of material fact.  They cannot demonstrate that there exist outstanding factual disputes which require Count II to reach a jury.  Accordingly, Plaintiffs' bad faith claim will be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Partial Summary Judgment as to Count II of the Complaint is granted.  An appropriate Order follows.

**BY THE COURT:**

**_____**

**R. BARCLAY SURRICK, J.**

21